ROBERT H. MORRISON AND PARMELIA L. MORRISON v. JOSEPH H. BERRY ET AL.

*Fixtures—Trover does not lie for fixtures placed by the husband on the wife's property.*

A married woman is not personally responsible, and her land is not bound, for improvements and expenditures made on it by her husband where no credit has been given to her and he has contracted on her behalf.

One who makes improvements on the land of a person who has not been in fault about it, does it at the risk of losing both his property and his labor.

Trover as for conversion of personal property does not lie on the refusal to surrender property which the defendant had himself annexed to the freehold intending it to be a fixture. So *held* where a dealer in gas manufacturing machines had caused one to be placed in a house which he afterwards found belonged to the wife of the man who contracted that the machine should be placed there.

Where permanent annexation to the freehold is intended, an article lawfully annexed becomes a fixture and part of the realty whether its removal would injure the freehold or not.

Error to St. Joseph. Submitted October 8, 1879. Decided January 13, 1880.

TROVER. Defendants bring error.

*C. W. W. Clarke* and *T. C. Carpenter* for plaintiffs in error. Trover will not lie for articles that have been converted into fixtures at the time the action is begun, *Mackintosh v. Trotter*, 3 M. & W., 184; Ferrard on Fixtures [2d ed.], 232; 2 Saund. Pl. & Ev., 1155; and if they are put up on the wife's premises but on the credit of the husband, she is not liable for their conversion, *West v. Laraway*, 28 Mich., 464; *Ainsley v. Mead*, 3 Lans., 116; *Corning v. Lewis*, 36 How. Pr., 425.

*D. E. Thomas* and *Ward & Palmer* for defendants in error.

CAMPBELL, J. This was an action of trover, brought against defendants below, who are plaintiffs in error, for the conversion of a gas machine and various auxiliary articles contained on a lot and in a house owned and occupied by defendant Parmelia Morrison, wife of defendant Robert H. Morrison. The alleged conversion consisted in a refusal to deliver back to the plaintiffs below those articles which had been furnished by them to Robert H. Morrison under a sale, which they claimed to have rescinded for fraud. The facts on which recovery was allowed below were substantially these:

In the spring of 1877 Robert H. Morrison was building five dwellings in the village of Sturgis, one of them being on property belonging to his wife, and the rest on property the precise ownership of which does not appear, but which does not seem to have been in him. An agent of Berry Brothers, who were interested in putting up machines for making gas, hearing from a third person that Morrison was building these houses, and without making any search or inquiry into the condition of the title, or whether it was good or clear, sought to induce Morrison to put in one of the machines in his residence, or two machines, one for four houses and the other for one house, and made him a written offer on

such basis. In case the larger proposition was accepted, they agreed to do the excavating and filling and furnish all the work necessary to complete the job.

In October a somewhat different contract was entered into in writing, for a single machine, at a different price, and Morrison was to be at the expense of excavating and filling and wood and mason work, which, however, was all to be done under the supervision of the gas-fitter. Payments were to be made in notes at four, five, six and eight months from November 1, 1877. The work was delayed by Berry Brothers, and not put in until January, 1878, and when completed, notes were given and received running from February 1, 1878. A small amount of money was also received.

On the 12th of March, 1878, the manager of Berry Brothers, who had gone to Sturgis to look after this claim, and who when there ascertained about the title, saw Mrs. Morrison (Mr. Morrison being absent), and offered to take back the property and cancel the indebtedness on the ground, as represented to her, that she would not be able to pay for it as things then stood, and made a demand to have it turned over to him. At a subsequent time, on the 29th of April, 1878, a demand was made of both the Morrisons, with a tender back of the notes and $25 cash which had been received. There is no evidence that Mrs. Morrison knew anything about the terms of the contract or of its existence, or that she did any act whatever out of which any ground of action or complaint could arise, except in not complying with this demand.

The court instructed the jury that if Morrison represented that the houses were his when they were not, and if Berry Brothers relied on that representation, they could rescind the contract of sale, and hold both parties liable in trover for the refusal to deliver the property back.

Upon an examination of this case it is very far from

being clear that there was evidence of fraud to avoid the
contract, and if the case were to turn upon that ques-
tion alone, it would be at least worthy of serious con-
sideration.    No questions seem to have been asked
concerning the title, and Morrison's attention does not
appear to have been called to the subject.  If the owner-
ship of the premises had any important bearing on the
conduct of the parties, it was certainly as important
to know whether they were encumbered, as in whom
the title stood, and inasmuch as the application was
made to Morrison and did not come from him, and no
inquiry was made of him, and inasmuch as he was in
fact building the houses, it is not easy to see why he
should necessarily assume or suppose that anything was
looked to beyond his general credit.    It seems quite
apparent that the desire of Berry Brothers to protect
themselves did not arise at all out of any supposition
that they had been defrauded by misrepresentations con-
cerning the title to the property.    Their manager went
out to Sturgis for that purpose before he knew anything
about the title, and did not, after discovering how it
stood, make any complaint to Mrs. Morrison that there
was any deceit in the matter, and made no demand on
that basis.  It was evidently the fact that Morrison had
been otherwise involved that led to this application to
Mrs. Morrison, which was based, not on fraud but on
her inability to pay.  And when the steps were taken to
rescind the contract, no reference whatever was made
to the condition of the title, or to any fraud in that
regard, as the reason for rescinding.    It was not until
two months or thereabouts after this second demand
that the agent who had conducted the business when
the contract was made, was informed by Mr. Mason, the
manager, who made the first demand, that the title was
not in Morrison.  He does not testify, and no one testi-
fies that the contract was actually rescinded on that
ground.

But however this may be, and assuming the contract

was lawfully capable of rescission, so far as Morrison is concerned, it seems to me very clear that no right of action exists against Mrs. Morrison. It has been decided on several occasions by this court that a married woman is not responsible in person, and that her land is not bound, for improvements and expenditures made on it by her husband, where no credit has been given to her, and where he has contracted on her behalf. *Newcomb v. Andrews*, 41 Mich., 518; *Emery v. Lord*, 26 Mich., 431; *Willard v. Magoon*, 30 Mich., 273.

It is also elementary doctrine that a person who makes improvements on the land of another, where the landowner has not been in fault about it, does so at the risk of losing both his property and his labor.

In the present case the annexation of the articles in question to the freehold was not a wrongful annexation of the property of the Berry Brothers, done without their authority. The contract made by them with Morrison not only contemplated the permanent annexation to the freehold of this property, but that it should be made under the direction and supervision of their own agent. It is not a question here whether articles of ambiguous character, not intended for permanent annexation, have become a part of the freehold. Here the intention was explicit and not open to any controversy. The case in no way differs from a contract to build a house on the lot, or to make repairs on it. The equities would be as strong in the one case as in the other, and the law is certainly identical in both cases. The amount of injury to the freehold which would be caused by the removal is not the question. If it is a part of the freehold, it cannot be taken away. The removal of locks from doors, or doors from their hinges, or windows from their frames, or fences and gates from the ground, may generally be made without doing any serious harm to the rest of the building beyond the inconvenience of doing without them, but no one has ever supposed they could be so removed without taking away what is a part of the freehold. See

further *Fryatt v. The Sullivan Co.*, 5 Hill, 116: affirmed, 7 Hill, 529.

A refusal to allow the removal of what has become, by the act and intervention of the demandant, a part of the freehold, cannot, in my opinion, be treated as a conversion of personal property.

⌐I think the judgment should be reversed with costs, and a new trial granted.

MARSTON, C. J., and GRAVES, J., concurred.

COOLEY, J. (dissenting). The defendants in error, composing the firm of Berry Brothers of the city of Detroit, brought suit in trover to recover of Robert H. Morrison and Parmelia L. Morrison, his wife, the value of a certain machine for lighting dwellings with gas, and of the connected pipe, fixtures etc., which had been sold by Berry Brothers to Robert H. Morrison, and located and put for use in certain dwellings in the village of Sturgis. The contract of purchase was made October 30, 1877, and the machine was put in and everything ready for use before the first day of February, 1878. The machine itself was buried in the ground, and the pipes ran from it into and through five dwelling-houses. Three of these it appears belonged at the time to Mrs. Morrison. No explanation is made by the record respecting the title to the others. The machine was on a lot belonging to Mrs. Morrison. It was claimed by the plaintiffs below—and the finding of the jury affirms the fact—that they sold to Mr. Morrison in reliance on his statements that he owned the houses, and that they would not otherwise have dealt with him. Their bill under the contract amounted to $1,056.27. Mr. Morrison paid them $25, and on February 1, 1878, executed and delivered to them his four notes of $225 each, payable respectively in four, five, six and eight months from date, with interest. For the balance he gave a draft on a bank at Sturgis. It is not claimed on either side that Mr. Morrison acted as his wife's agent in making the purchase, or that she was

in any manner privy to his representations. She however lived at the time with him in one of the three houses, and knew what was being done; and there was evidence in the case that she expressed her satisfaction with the working of the machine, and said that no injury had been done in putting in the pipes. How the pipes were put in—whether inside or outside the walls—does not appear.

In March, 1878, the vendors seem for the first time to have learned that Mr. Morrison did not own the property, and that he had no pecuniary responsibility. An agent then went to see the defendants, but found only Mrs. Morrison; the husband being then absent and his whereabouts unknown. Some attempt was made to negotiate with Mrs. Morrison, and the agent offered to cancel Mr. Morrison's indebtedness under the contract if she would give up what had been obtained under it, but she declined to do anything about it in the absence of her husband. In the following month a formal tender was made to Mr. and Mrs. Morrison severally, of the notes and draft given by him, and of the $25 he had paid, and the machine, pipe, etc., were demanded of them; but they refused to receive what was tendered or to surrender what they had got. This action was then brought. It was conceded on the trial that the value of that portion of the articles purchased, which was upon the premises owned by Mrs. Morrison, was $833.16, and for this sum the plaintiffs, under the charge of the court, obtained a verdict.

The defense which is relied upon is that, by annexation to the freehold all the articles sued for became a part of the realty, and therefore trover would not lie for their conversion. The fraud was indeed denied in the court below, but as that was found by the verdict, we have no concern with the facts by which it was made out, and upon this record must assume its existence. The question now is whether, the fraud being assumed, the purchase and the annexation to the realty constituted the articles permanent fixtures.

The general rule is not disputed that when property is obtained through fraud, under color of a purchase, the vendor may rescind, and is entitled to demand and receive back the property on returning within a reasonable time what he has received and placing the vendee in *statu quo*. *Martin v. Ash*, 20 Mich., 166; *Wilbur v. Flood*, 16 Mich., 40. But this case differs from ordinary contracts of purchase in the fact that the party to whom the property has been delivered, and who now appropriates it, was in no manner connected with the fraud in the purchase; and as personal dishonesty is not charged upon her, the case must be decided upon the assumption that she has been guilty of none, and that the wrong has been on the part of her husband exclusively.

On the other hand there is no pretense that Mrs. Morrison has dealt with her husband in any capacity in respect to the articles in controversy. He was not her agent in buying them, nor did he buy and then sell to her. Had she purchased them from him in good faith, without knowledge of his fraud, she would beyond doubt have been entitled to retain them, and the original vendors must incur all the risks of investing their vendee with the evidences of title to their property. But she has bought nothing; she has simply been quiescent while her husband has been making these improvements upon her premises.

Neither was there any claim in the court below that the machine, pipe and fixtures could not be removed without injury to the premises. The hole in the ground would necessarily be opened, but any injury from this would be insignificant, and as the pipe was put into the houses without injury, it would presumptively be taken out without injury. If the method in which it was put up rendered this impracticable, it would fairly devolve on the party proposing on this ground to appropriate the property of others, to make out the fact very clearly. No attempt was made to do so.

The case then is this: The plaintiffs parted with

their goods under circumstances which entitle them to rescind the sale and recover them back or their value. The purchaser who obtained the goods from them by fraud, has affixed them to the realty of a third person, but under such circumstances that, had the realty been his, he could not have retained them. The third person, without a shadow of equity, now seeks to retain them on the purely technical ground that, by being affixed to her realty, their legal nature has been changed and they have become an inseparable part of her own property. This technical claim constitutes the sole defense in the case.

It was said in *Adams v. Lee*, 31 Mich., 440, that unity of title in the freehold and in that which is annexed to it, is essential in order that the latter may become a part of the realty. It is not pretended that there was any such unity of title here, unless the annexation itself brought it about; and to give to mere annexation that effect would leave to the case of *Adams v. Lee* no support whatever. The old notion that physical annexation should have this extraordinary effect was said in *Meigs's Appeal*, 62 Penn. St., 28, to be exploded, and that the question of fixture or no fixture must depend upon the intention of the parties. "There is," says the Chief Justice in *Wheeler v. Bedell*, 40 Mich., 693-696, "no universal test whereby the character of what is claimed to be a fixture can be determined in the abstract. Neither the mode of annexation nor the manner of use is in all cases conclusive. It must usually depend on the express or implied understanding of the parties concerned." To this effect are cited *Crippen v. Morrison*, 13 Mich., 23, and *Robertson v. Corsett*, 39 Mich., 777, among other cases. But who are the parties whose consent or understanding must control? It was said by Mr. Justice Ladd in *Cochran v. Flint*, 57 N. H., 514-547, that if it were held that if A, having in his possession the movable thing of B, annexes it without consent of the owner to the real estate of C, it would thereupon, and by force of

that act alone, become the property of C, such a decision, so far as his investigations had extended, would stand alone, and would be so manifestly contrary to reason and justice, as well as the fundamental principles of law relating to the acquisition and ownership of property, that he could only follow it from a sense of duty that would amount to moral compulsion. We have been as much unable as that learned judge was to find any such decision. One man cannot give away the property of another in this manner. The consent of parties that shall convert a chattel into an inseparable part of realty is the consent of the parties owning the chattel and the realty respectively. *D'Eyncourt v. Gregory*, L. R. 3 Eq. Cas., 382–397: *Reese v. Jared*, 15 Ind., 142.

No doubt in this case Mrs. Morrison must be deemed to have assented to the things annexed becoming a part of the freehold. But the consent of the plaintiffs was obtained by fraud, and therefore, unless they saw fit to affirm it afterwards, was no consent at all. They do not affirm, but withdraw it, and therefore as between themselves and Mr. Morrison, it is as if it had never been given. Now unless some equities in favor of Mrs. Morrison are found to have intervened between the time when the purchase was made and the time when consent was withdrawn, it is impossible that she should occupy any position more favorable than does her husband. When she has paid nothing, done nothing, and suffered nothing whereby she is to lose in the event that the articles are withdrawn, she must stand in his shoes, and has no footing otherwise.

The equities in this case are all against Mrs. Morrison. It was a part of the fraudulent purpose of her husband that the machine and its conveniences should be attached to her estate in order that she might hold and enjoy it as her own. When she refuses to restore what he thus fraudulently obtained, she is seeking to appropriate the fruits of his fraud. Had she bought the articles from her husband, and paid for them, the

husband's vendors might now be estopped from claiming them; but the elements of estoppel are wholly wanting. It appears to me to be a plain case in which the defrauded parties demand their property, and no one is claiming any adverse right to it except such as the fraud itself can give.

The judgment, I think, should be affirmed with costs.